UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x
RAVEN'S LANDING, LLC d/b/a DR. NATURE RX, HEMPED
NYC, LLC, HIDDEN HEMP CORP., HEMPED NYC ON
ORCHARD LLC, GASKO & MEYER INC.,
SARENE CRAFT BEER DISTRIBUTORS, LLC,
WINDY HILL 312 LLC d/b/a WINDY HILL CBD AND
WELLNESS, NORTH FORK DISTRIBUTION, INC.
d/b/a CYCLING FROG, AND THE GREEN ROOM,
REBEL RABBIT

<div align="center">Petitioners,</div>

- against-                                                    **VERIFIED PETITION**

NEW YORK STATE CANNABIS CONTROL :
BOARD, NEW YORK STATE OFFICE OF :
CANNABIS MANAGEMENT, TREMAINE WRIGHT, :
in her official capacity as the Chairwoman of the New :
York State Cannabis Control Board, and CHRIS :
ALEXANDER, in his official capacity as Executive :
Director of the New York State Office of Cannabis :
Management,

<div align="center">Respondent(s).</div>

--------------------------------------------------------------------------x

   Petitioners RAVEN'S LANDING, LLC, HEMPED NYC, LLC, HIDDEN HEMP CORP.,

HEMPED NYC ON ORCHARD LLC, GASKO & MEYER INC., SARENE CRAFT BEER

DISTRIBUTORS, LLC, WINDY HILL 312 LLC d/b/a WINDY HILL CBD AND WELLNESS,

NORTH FORK DISTRIBUTION, INC, d/b/a CYCLING FROG, THE GREEN ROOM AND

REBEL RABBIT (hereinafter collectively, "Petitioners"), by and through their attorneys,

Mandelbaum Barrett PC, commence this Section 1983 proceeding against the Respondents NEW

YORK STATE CANNABIS CONTROL BOARD ("CCB"), NEW YORK STATE OFFICE OF

CANNABIS MANAGEMENT ("OCM"), TREMAINE WRIGHT in her official capacity as the

Chairwoman of the CCB ("Wright") and CHRIS ALEXANDER, in his official capacity as

Executive Director of the New York State OCM ("Alexander") (hereinafter collectively, "Respondents"), respectfully allege as follows:

## NATURE OF THE ACTION

1.      This is an Action brought under 42 U.S.C. § 1983 for Respondents' violations of Petitioners' constitutional rights arising under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution resulting in millions of dollars in losses. This matter concerns the unconstitutional misuse of regulatory might, power, and procedure. At stake herein is not only the integrity of the legal process and lawful procedure under State Law, but the protection of one the most inviolate rights upon which this country was founded: the Constitutional right to due process of law.

2.      Petitioners are businesses who manufacture, distribute, or sell hemp-infused products in New York State. By this special proceeding, Petitioners seek to preliminarily and permanently enjoin Respondents from implementing and/or enforcing the revised regulations amending 9 NYCRR § 114, which were adopted on November 17, 2023 (the "Revised Regulations"), after a New York State Court deemed unlawful and enjoined enforcement of similar emergency regulations amending 9 NYCRR § 114, which were hastily, and ultimately unlawfully, adopted on July 19, 2023 (the "Emergency Regulations"), pertaining to the production and sale of cannabinoid hemp products.   Petitioners seek immediate redress from Respondents' unconstitutional violation of Petitioners' Fourth Amendment rights against unreasonable searches and seizures.

3.      As detailed below, each Petitioner satisfies the requirements for the presentment of an action under 42 U.S.C. § 1983. Each Respondent was acting under the color of state law for Respondents as an administrative and regulatory agency operating under the authority of law, *i.e.*,

The Office of Cannabis Management ("OCM"). The Office of Cannabis Management acts under the color of State Law when it enacts regulations relevant to recreational cannabis and cannabinoid hemp industries in New York State.

### PARTIES

4.      Petitioner Raven's Landing, LLC d/b/a Dr. Nature RX ("Raven's Landing") is a New York limited liability company with its principal place of business located in Astoria, New York. Raven's Landing is a duly licensed hemp retailer that specializes in a wide range of hemp derived CBD infused products including oil tinctures, topical products, edibles products, and hemp flower products.

5.      Petitioner Hemped NYC, LLC ("Hemped NYC") is a New York limited liability company with its principal place of business located in New York, New York. Hemped NYC is a retailer specializing in hemp derived-CBD products including oil tinctures, topical products, hemp infused beverages, and CBD flower products.

6.      Petitioner Hidden Hemp is a New York corporation with its principal place of business located in, Brooklyn, New York.  Hidden Hemp is a retailer specializing in hemp derived-CBD products including oil tinctures, topical products, hemp infused beverages, and CBD flower products. Hidden Hemp also has a second location at 411 7th Avenue, Brooklyn, New York.

7.      Petitioner Hemped NYC on Orchard, LLC ("Hemped Orchard") is a New York limited liability company with its principal place of business in New York, New York. Hemped Orchard is a retailer specializing in hemp derived-CBD products oil tinctures, topical products, hemp infused beverages, and CBD flower products.

8.      Petitioner The Green Room is a duly licensed hemp retailer in New York County, New York. The Green Room was a retailer that specialized in a wide range of hemp derived CBD

infused products including oil tinctures, topical products, edibles products, and hemp flower products.

9.      Petitioner North Fork Distribution, Inc. d/b/a Cycling Frog ("Cycling Frog") is a Washington corporation. Cycling Frog is a hemp beverage brand that manufactures and sells hemp derived CBD infused beverages in various jurisdictions, including in New York State.

10.      Petitioner Sarene Craft Beer Distributors, LLC ("Sarene Craft") is a New York limited liability company with its principal place of business in Elmsford, New York. Sarene Craft is a wholesaler specializing in hemp derived-CBD beverages including beer, seltzers, coffee, and kombucha.

11.      Petitioner Gasko & Meyer, Inc. ("Gasko & Meyer") is a New York Corporation with its principal place of business in Lake Huntington, New York. Gasko & Meyer is a beverage distributor specializing in beer, wine, and hemp derived CBD infused beverages.

12.      Petitioner Windy Hill 312 LLC d/b/a Windy Hill CBD and Wellness ("Windy Hill") is a New York limited liability company with its principal place of business in Greenwich, New York. Windy Hill is a retailer specializing in hemp derived-CBD products including oil tinctures, topical products, gummies, sage, and candy.

13.      Petitioner Rebel Rabbit is a South Carolina corporation. Rebel Rabbit is a hemp beverage brand that manufactures and sells hemp derived CBD infused Seltzers in various jurisdictions, including in New York State.

14.      Respondent New York State Office of Cannabis Management ("OCM") is an independent office established by the Marihuana Regulation and Taxation Act ("MRTA") within the Division of Alcoholic Beverage Control.

15.     Respondent New York Cannabis Control Board ("CCB") is a government-appointed board established by the MRTA responsible for approving the comprehensive regulatory framework for New York State's cannabis industry, including issuing applications and licenses to cannabis businesses. It consists of one chairperson and four voting members.

16.     Respondent Chris Alexander is, and was, at all times relevant to this action the Executive Director of OCM, having the powers and duties granted to him in his official capacity, and is named in his official capacity.

17.     Respondent Tremaine Wright is, and was, at all times relevant to this action the Chairwoman of the CCB, having powers and duties granted to her in her official capacity, and she is named in her official capacity.

## JURISDICTION AND VENUE

18.     Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331 and 1434(3) and (4) as this action seeks redress for the violation of Petitioners' Constitutional and Civil Rights.

19.     This Court has subject matter jurisdiction to decide this Petition pursuant to New York Civil Practice Laws and Rules ("CPLR") § 7803 because the Revised Regulations were adopted by Respondents in violation of lawful procedure, affected by an error of law, and are arbitrary and capricious.  This Court also has jurisdiction to render a declaratory judgment pursuant to CPLR § 3001 and has jurisdiction over the constitutional violations and money damages claims pursuant to 42 U.S.C. 1983.

20.     This Court has personal jurisdiction over Respondents pursuant to CPLR § 301 because Respondents maintain their principal places of business in New York and/or regularly transact business in the State of New York.

21.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391(b) and (c).

## JURY DEMAND

22.     Petitioners respectfully hereby demand a trial by jury for all issues so triable in this action pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

I.     **The Regulatory Schemes**

a.     **The Federal Agriculture Improvement Act Of 2018**

23.     In December of 2018, Congress passed the Agriculture Improvement Act of 2018, otherwise known as the "Farm Bill." The legislation was significant for its removal of industrial hemp and hemp derived products from its Schedule I status under the Controlled Substances Act, making it an ordinary agricultural commodity, and immediately opening opportunities for hemp derivative products for industrial, recreational, and medical use.[1]

24.     Hemp is a versatile and multifunctional plant that belongs to the Cannabis sativa species that contains trace levels of delta-9-tetrahydrocannabinol (THC) - the psychoactive compound in cannabis. Hemp's versatile nature has led to its use in a wide range of industries, including textiles, food, and even manufacturing items like biofuels, bioplastics, insulation, and automotive parts.[2]

25.     THC stands among numerous cannabinoids, which are organic compounds inherent to the cannabis plant, each exerting distinct effects. The cannabis plant harbors over 100 cannabinoids, yet THC and cannabidiol ("CBD") are the most prevalent and employed.

---

[1]  https://www.usda.gov/topics/hemp#:~:text=The%20Agriculture%20Improvement%20Act%20of%202018%20(2018%20Farm%20Bill)%20authorized,DEA)%20schedule%20of%20Controlled%20Substances

[2]  https://pubchem.ncbi.nlm.nih.gov/compound/Cannabidiol

26.     As defined by the Farm Bill, cannabinoid hemp is any product processed or derived from hemp plants that is used for human consumption, including for topical application, for its cannabinoid content, that does not contain more than 0.3% Delta-9 THC on a dry weight basis. If the weight of the Delta-9 THC is more than 0.3%, then the product is considered to be "marihuana."[3] Cannabidiol or "CBD" products are an example of cannabinoid hemp products and can come in a variety of different forms including but not limited to tinctures (CBD oil), pills, capsules, balms, lotions, and food or beverage products.

**b.  New York's Marihuana Regulation And Taxation Act**

27.     On March 31, 2021, the MRTA was signed into law by then-Governor Andrew Cuomo, opening New York as a legitimate marketplace for medical cannabis, and the regulated sale of recreational adult-use cannabis and cannabinoid hemp products.[4]

28.     The MRTA authorizes the use of cannabis for adults and establishes the OCM as an autonomous entity under the Division of Alcoholic Beverage Control, entrusted with regulatory oversight of the adult-use and medical market, and charged with executing the powers and duties specified in the MRTA.[5]

29.     More specifically, the OCM is responsible for:  (i) launching the adult-use cannabis and cannabinoid hemp programs in New York; (ii) establishing a licensed and well-regulated cannabis industry that prioritizes consumer education and safety; (iii) generating substantial tax revenue from cannabis sales to reinvest in communities disproportionately affected by federal and

---

[3]  https://cannabis.ny.gov/cannabinoid-hemp-consumers
[4]  The Marihuana Regulation and Taxation Act ("MRTA") (Chapter 92 of the Laws of 2021) (signed March 31, 2021).
[5] *See* MRTA §§ 8, 9, 11.

state drug policies; and (4) "reduc[ing] the illegal drug market … and reduc[ing] the participation of otherwise law-abiding citizens in the illicit market."[6]

30.     The MRTA also established the CCB, which oversees OCM, and performs tasks, such as the promulgation of rules and regulations.

31.     Under Section 79 of the MRTA, the CCB is authorized to conduct "inspections of all licensed or permitted premises by the duly authorized representatives of the board, by any peace officer acting pursuant to his or her special duties, or by a police officer."[7]

32.     However, the MRTA expressly states that the CCB shall make reasonable accommodations so that ordinary business is not interrupted, and safety and security procedures are not compromised by the inspection.[8]

33.     Likewise, a person who holds a license or permit must make himself or herself, or an agent thereof, available and present for any inspection required by the CCB.[9]

34.     Pursuant to Section 13 of MRTA, the CCB has the authority to "promulgate any and all necessary rules and regulations governing the cultivation, manufacture, processing, transportation, distribution, testing, delivery, and sale of medical cannabis, adult-use cannabis, and cannabinoid hemp and hemp extract."[10] These powers include the CCB's authority to enforce temporary "emergency" rules. However, in adopting any emergency rule, the CCB is required to "comply with the provisions of subdivision six of section two hundred two of the state administrative procedure act . . . and strict compliance with the provisions shall be required.[11]"

---

[6] *See* MRTA §§ 2; 99-ii(3)(f); 99-kk.
[7] *See* MRTA § 79.
[8] *Ibid.*
[9] *Ibid.*
[10] MRTA § 13.
[11] MRTA § 13(3)(a)-(d)(*emphasis added*).

35.     Section 202(6)(a) of the Administrative Procedure Act ("APA") is titled "Notice of Emergency Adoption" and provides in pertinent part that "if an agency finds that the immediate adoption of a rule is necessary for the preservation of the public health, safety or general welfare and that compliance with the requirements of subdivision one of this section would be contrary to the public interest, the agency may dispense with all or part of such requirements and adopt the rule on an emergency basis."

36.     Section 202(6)(d)(iv) of the APA further instructs that a notice of emergency adoption *shall* contain:

> [T]he findings required by paragraphs (a) and (c) of this subdivision and ***include a statement fully describing the specific reasons for such findings and the facts and circumstances on which such findings are based.*** Such statement shall include, at a minimum, a description of the nature and, if applicable, location of the public health, safety or general welfare need requiring adoption of the rule on an emergency basis; a description of the cause, consequences, and expected duration of such need; an explanation of why compliance with the requirements of subdivision one of this section would be contrary to the public interest; and an explanation of why the current circumstances necessitates that the public and interested parties be given less than the minimum period for notice and comment provided for in subdivision one of this section.

Section 202(6)(d)(iv) (emphasis added).

### c.   New York's Cannabinoid Hemp Regulations-9 NYCRR § 114

37.     In conjunction with the MRTA, on or about November 24, 2021, the OCM adopted cannabinoid hemp regulations codified at 9 NYCRR § 114 ("Prior Hemp Regulations").

38.     The Prior Hemp Regulations only required that products contain no more than 0.3% total Delta 9-THC concentration. There was no required ratio between CBD and THC.

39.     The Prior Hemp Regulations also specifically address the licensing requirements for a hemp retailer, stating in relevant part:

> No person shall offer or sell cannabinoid hemp products to consumers in New York State, or hold itself out as a cannabinoid hemp retailer, unless it is in compliance

with Article 5 of the Cannabis Law and this Part and is licensed by the office as a cannabinoid hemp retailer.[12]

40.     The Prior Hemp Regulations also enforced procedural safeguards for hemp retailer licensees, requiring that "where a licensee willfully violates, refuses or neglects to comply with one or more sections of [the Prior Hemp Regulations], the office may limit, suspend, revoke or annul a license after providing notice and an opportunity for a hearing to the licensee.  However, a license may be temporarily limited, suspended, revoked or annulled without a hearing for a period ***not to exceed 30-days, upon notice to the licensee***, following a finding by the office that the public health, safety or welfare is in imminent danger".[13]

41.     Under the Prior Hemp Regulations, the OCM may conduct random sampling and testing of hemp, hemp extract, cannabinoid hemp products, or any solvents, chemicals, or materials used by the licensee, unannounced, at any time during normal business hours of the licensee.[14]  This applies ***only*** to a hemp processor, ***not*** a hemp retailer.

42.     As discussed in more substantive detail below, despite the OCM's July 19, 2023 Emergency Adoption and Proposed Rulemaking Concerning Amendments to Cannabinoid Hemp Regulations, noticeably absent from the Hemp Regulations are any statutes or guidelines concerning the seizure of cannabinoid hemp products from otherwise validly licensed hemp retailers, or any administrative or procedural remedy for the forced seizure of cannabinoid hemp products from licensed retailers that comply with MRTA and Hemp Regulation licensing, packaging, laboratory testing or retail sales.

---

[12] Section 114.3
[13] Section 114.17-penalties.
[14] Part 114-CITE

43.     Rather, under the Hemp Regulations, the OCM is merely authorized to inspect any retail location offering cannabinoid hemp products, which may include taking samples of cannabinoid hemp products to ensure compliance by hemp processors.[15]

### d. **Emergency Regulations Are Implemented, Deemed Unlawful and Their Enforcement Enjoined**

44.     On July 19, 2023, the CCB issued Resolution No. 2023-29, titled, "Resolution Directing the Office of Cannabis Management to File a Notice of Emergency Adoption and Proposed Rulemaking Concerning Amendments to Cannabinoid Hemp Regulation" ("Resolution").  (Annexed hereto as Exhibit A.) The Resolution sought to make significant substantive changes to the Hemp Regulations in 9 NYCRR § 114, most of which had an immediate and devastating effect on legally cognizable cannabinoid hemp retailers - forcing the pulling of products from shelves and incentivizing consumers that would otherwise purchase their products from Petitioners to turn to illegal, unregulated, untested, and untaxed cannabinoid hemp and illegal cannabis retailers.

45.     The Resolution states in pertinent part:

**WHEREAS,** pursuant to Article 5 of the Cannabis Law, the [CCB] is charged with the responsibility to govern activities related to cannabinoid hemp;

**WHEREAS,** pursuant to Sections 10(4), 13(5) and 91 of the Cannabis Law, the Board finds it 'necessary for the preservation of the public health, safety [and] welfare…' of this State to invoke its express emergency rulemaking authority to establish emergency rules and act with expediency, by recommending the [OCM] implement, such emergency rules to address the activities related to intoxicating cannabinoid hemp products;

**WHEREAS,** [CCB] has seen the creation and sale of intoxicating cannabinoid products, which frustrates the separation of two distinguishable programs: the cannabinoid hemp program and the adult-use cannabis program and creates an unsafe environment for cannabinoid hemp consumers; [and]

---

[15]  *See* MRTA § 114.11 Requirements for cannabinoid hemp retailers

**WHEREAS,** the proliferation of intoxicating cannabinoid hemp products in the marketplace requires [CCB's] response to protect the health and safety of cannabinoid hemp consumers by way of emergency amendments.

46.     The sudden implementation of the Emergency Regulation-Part 114 Cannabinoid Hemp Regulations resulted in a devastating and immediate blow to New York cannabinoid licensees. (Annexed hereto as Exhibit B). The Emergency Regulations included: (1) rules limiting the total THC and cannabinoid levels and establishing a minimum allowable CBD: THC ratio in cannabinoid hemp products; (2) revisions to cannabinoid hemp retailer prohibitions to prohibit the sale of cannabinoid hemp products containing over 0.5 milligrams of total THC per serving to individuals under the age of twenty-one; (3) revisions to the current laboratory testing requirements for cannabinoid hemp products; and (4)  requirements for the packaging, labeling, marketing, and advertising of cannabinoid hemp products.

47.     Particularly egregious were subdivisions (a)(3), (b)(1)(i) and (b)(1)(ii) to Section 114.8, which regulate which, if any cannabinoid hemp products can be sold by retailers in New York State. The Emergency Regulations required manufacturers to meet new formulation requirements that have been untested, and are unlikely to be palatable to consumers.

48.     Pursuant to Part 114.8(a)(3) of the Emergency Regulations, all cannabinoid hemp products distributed or offered for retail sale in New York State shall "except for flower products or topical products contain a ratio of CBD to THC that is 15:1 or higher, provided however, if CBD is not the primary marketed cannabinoid, the sum of cannabinoids excluding THC must have a ratio of 15:1 THC."[16]  Under 114.8(b)(1)(i) and (b)(1)(ii), all cannabinoid hemp products distributed or offered for retail sale in New York State must contain no more than 10 milligrams total THC per package, with no more than 1 milligram total THC per serving; and "3,000

_____

milligrams of total cannabinoids per package, with no more than 100 milligrams of total cannabinoids per individual serving."

49.    The CCB published an "Emergency Justification" stating the basis for the Emergency Regulations:

> Emergency action is necessary for the preservation of the public health, safety, and general welfare to ensure that the [CCB] can prevent the manufacturing and retail sale of intoxicating cannabinoid hemp products in New York State.
>
> In 2018, the U.S. Government passed the Agriculture Improvement Act, commonly known as the Farm Bill, which defined hemp to distinguish it from cannabis, limiting hemp to a delta 9 THC concentration of no more than 0.3% on a dry weight basis, compared to cannabis which can surpass 0.3% THC. This 2018 Farm Bill definition of hemp is currently being used by processors to produce cannabinoid hemp products which contain intoxicating levels of THC due to the product's net weight being higher than that of cultivated hemp biomass on a dry weight basis. In fact, processors have also exploited the ambiguity of federal law by producing products with higher levels of other types of THC cannabinoids which, as a result, have the same intoxicating effect as cannabis products. A wide variety of these intoxicating cannabinoid hemp products are sold online and in retail stores without verifying the age of the consumer purchasing the product. These intoxicating products are available in a variety of forms, including edibles, beverages, tinctures, and supplements.
>
> The way that these intoxicating products are allowed to be made and sold in accordance with the 2018 Farm Bill is inconsistent with New York's intent to regulate, control, and tax cannabinoid hemp products in a manner that protects the public health, safety, and welfare of the people in the state. Intoxicating cannabinoid hemp products frequently mislead consumers to believe the product contains very little, or no THC, when in fact the finished product could contain intoxicating levels of THC. This ambiguous labeling puts consumers at risk of overconsumption and accidental ingestion of intoxicating levels of THC or other adverse events. In cases of young children accidently consuming such products, it can result in hospitalization and in very rare cases, death. Intoxicating cannabinoid hemp products pose an immediate risk to the health and safety of consumers, youth, and adolescents who have access to these products, and to young children who can accidently consume these products, mistaking them for other consumer goods like food.
>
> These emergency regulations are necessary to immediately allow [OCM] to address several challenges with the processing and retail sale of cannabinoid hemp products in New York State, protect public health and safety by, among other things, limiting the THC content of these products and ensuring consumers are not misled by these

products' marketing. The emergency regulations include rules limiting the total THC and cannabinoid levels and establishing a minimum allowable CBD:THC ratio in cannabinoid hemp products; revision to cannabinoid hemp retailer prohibitions to prohibit the sale of cannabinoid hemp products containing over 0.5 milligrams of total THC per serving to individuals under the age of twenty-one; revisions to the current laboratory testing requirements for cannabinoid hemp products; and requirements for the packaging, labeling, marketing, and advertising of cannabinoid hemp products. Additionally, revisions have been made to rectify some inconsistencies in these terms and the revised adult-use regulations that are currently in the public comment period. These updates eliminate any potential confusion in how the adult-use and cannabinoid hemp terms are understood.

50.     The Emergency Regulations were thereafter filed for publication in the State Register on July 27, 2023, thus making the regulatory amendments effective immediately, with the exception of revised packaging, labeling and advertising requirements which went into effect on January 1, 2024.[17]

51.     On November 9, 2023, the New York State Court of Albany entered an order prohibiting and enjoying Respondents from enforcing the Emergency Regulations adopted on July 27, 2023, Amending 9 NYCRR § 114.

52.     The judge found that: "the Emergency Justification fails to cite evidence or studies to substantiate that New Yorkers have either been misled or harmed by hemp infused products. The Emergency Justification also fail[ed] to cite facts showing New Yorkers have either overconsumed or accidentally ingested intoxicating levels of THC. Likewise, the Emergency Justification's parade of horrible that await children from petitioners' products lack specific recital of any actual facts upon which such concerns are based."

53.     The judge held that "in the end, Respondents at best only reasonably forecasted the potential for trouble, the potential that 'bad things [might or could be] happening' is insufficient

to justify an 'immediate necessity [or] emergency' allowing Respondents to deploy the SAPA's procedures for emergency rulemaking."

54.     Moreover, the judge stated, "it is likely that Respondent's Emergency Justification does not comply with SAPA 202 (6) (d) (iv) and consequently, invalidates Respondents' emergency regulation."

e.  **CCB'S Adoption Of Regulations Amending 9 NYCRR § 114 Following the Decision**

55.     On November 17, 2023, CCB approved the adoption of regulations amending 9 NYCRR § 114. (Annexed hereto as Exhibit C, Revised Regulations).  This revised regulation seeks to make considerable substantive changes to the Prior Hemp Regulations in 9 NYCRR § 114, most of which have an immediate and catastrophic effect on legally recognized cannabinoid hemp retailers and wholesalers- forcing the pulling of products from shelves and incentivizing consumers that would otherwise purchase their products from Petitioners to turn to illegal, unregulated, untested and untaxed cannabinoid hemp and illegal cannabis retailers.

56.     The Revised Regulations, just like the Emergency Regulations the Court struck, state:  (1) products must contain no more than 0.3% total Delta 9-THC concentration; (2) except for flower products or topical products, products must contain a ratio of CBD to THC that is 15:1 or higher; (3) products must accurately reflect testing results and not contain less than 80% or more than 120% of the concentration of total cannabinoid content as listed on the product label; (4) products must comply with product testing standards for cannabinoid hemp products set forth in 9 NYCRR Section 114.10; and (5) All cannabinoid hemp products distributed or offered for retail sale in New York State are prohibited from:  containing liquor, wine, beer, cider, containing tobacco or nicotine, being in the form of an injectable, inhaler, product including cigarette, cigar,

pre-roll, or any other disallowed form determined by the OCM, containing synthetic cannabinoids, artificially derived cannabinoids, or cannabinoids created through isomerization, including, but not limited to, Delta 8-THC and Delta 10-THC.

57.     This is a significant change from the Prior Hemp Regulations as the Prior Hemp Regulations only required that products contain no more than 0.3% total Delta 9-THC concentration. There was no required ratio between CBD and THC. Thus, now implementing a ratio at 15:1 drastically limits the products available for market.

58.     Respondents executed the Revised Regulations on the mere supposition that:  (1) intoxicating products are allowed to be made and sold in accordance with the 2018 Farm Bill is inconsistent with New York's intent to regulate, control, and tax cannabinoid hemp products in a manner that protects the public health, safety, and welfare of the people in the state; (2) ambiguous labeling of cannabinoid hemp products may mislead consumers in consumption; and (3) young children may accidentally consume cannabinoid hemp products.[18]

59.     To be clear, since the enaction of the MRTA in 2021, the New York market has benefitted from hemp cannabinoid products without incident. New York cannabinoid hemp retailers have been operating with the same product and with the same levels of THC cannabinoid levels without any need to impose revised regulations. In fact, the failure to fully explain the reasoning here could generate public confusion as to the safety concerns, and in turn, lead to the public justifiably questioning the role of Revised Rules and if, in this case, they really are necessary.

60.     In addition to Respondents' failure to articulate any cognizable basis to enact the Revised Regulations cannabinoid hemp licensees have been offered no basis by which

---

[18] *See* Exhibit B.

Respondents derived the 15:1 ratio of CBD to TCH, or serving and per package THC limits. As a result, the licensee has no explanation to provide to consumers why products that have been on the market for a notable period of time are no longer available. Until new formulas for cannabinoid hemp products can be created, executed and ready to ship for consumer sale, the cannabinoid hemp market has been essentially halted.

61.     In the meantime, New York consumers will be pushed into the illicit and underground market, in direct contravention of the Legislature's objective by enacting the MRTA to (i) "reduce the illegal drug market," (ii) "reduce the participation of otherwise law-abiding citizens in the illicit market," and (iii) "protect the public health, safety and welfare" of New Yorkers.[19]"

62.     Indeed, recent reports estimate that approximately 1,400 shops in New York City are currently selling cannabis products illegally. These illicit stores with potentially contaminated and counterfeit cannabis products from people/groups, are taking advantage of Respondents' laissez-faire approach to enforcement.[20]

63.     The fact remains that Emergency Regulations and Revised Regulations that were adopted in the absence of true justification are inherently arbitrary and capricious, and an abuse of an agency's discretion for that reason alone. *Gill v. New York State Racing & Wagering Bd.,* 11 Misc. 3d 1068(A) (Sup. Ct. N.Y. Co. Feb. 9, 2006).

64.     Initially, the Emergency Regulations and Revised Regulations failed to include any mention of scientific or other foundations that support their intention to uphold public health, safety, and well-being. The Respondents have not provided any explanation regarding the

---

[19]  *See* MRTA § 2.
[20]   *See* Cailley LaPara, Influx of Counterfeit Cannabis Threatens New York's Nascent Legal Weed Market, BLOOMBERG (Feb. 6, 2023), https://www.bloomberg.com/news/newsletters/2023-02-06/fake-vapes-counterfeit-cannabis-productsthreaten-new-york-legal-weed,

methodology used to establish the 15:1 CBD to THC ratio, or the rationale behind setting the THC limits at 1 milligram per serving and 5 milligrams per package. Petitioners are not privy to any studies or literature that suggest these stipulations are rooted in considerations for public health, safety, or welfare. Nor are Petitioners privy to any data to justify any change to the Prior Hemp Regulations via emergency rulemaking or possibly even regular rulemaking.

65.     Moreover, Respondents have failed to take into consideration certain foreseeable adverse effects of these requirements, including both adverse effects on Petitioners' businesses as well as adverse effects on the health, safety, and welfare of New York consumers of cannabinoid hemp products.

66.     The first problem arises from the fact that the Revised Regulations will essentially force decreased sales if not closure of Petitioners' otherwise lawful cannabinoid hemp retailer businesses altogether. In order for Petitioners to comply with the regulations, they will need to effectively destroy all non-compliant products for sale and wait for manufacturers to change the basic formulations or all of their products, which could take months if not years to perfect, as well as costing petitioners thousands of dollars.

67.     As noted above, Petitioners' cannabinoid hemp retailer locations predominately sell tinctures, oils, and edibles for consumption with an authorized CBD to THC ratio.  Under the new regulations, over 75% of their products are non-compliant with the Revised Regulations and will require immediate removal from their shelves under threat of fines, license revocations, or civil proceedings including exorbitant monetary damages.

68.     Second, even if Petitioners are able to obtain cannabinoid hemp products that meet the 15:1 CBD to THC ratio adopted by Respondents in the Emergency Regulations and Revised

Regulations, Petitioners will be forced to offer products that would increase the risk of adverse consumer reactions.

69.     The Emergency Regulations and Revised Regulations offer no guidance on the ratio of CBD substitute cannabinoids, and do not distinguish intoxicating cannabinoids from non-intoxicating cannabinoids.  Therefore, a manufacturer could replace CBD with other cannabinoids such as cannabinol (CBN) and/or tetrahydrocannabivarin (THCV), in the required 15:1 ratio and produce a technically compliant product even though doing so would defeat the purported purpose of the Revised Regulations and open consumers to overconsumption or turn to the illicit cannabis and cannabinoid hemp markets that plague New York State.

70.     None of these considerations appear to have been taken into account by Respondents, thus rendering the substance of the Revised Regulations arbitrary and capricious.

## II.     The State's Arbitrary, Capricious And Unreasonable Enforcement Of The Regulations

### a.     OCMS's Raids On Hidden Hemp Headquarters

71.     Hidden Hemp is a duly licensed hemp retailer in Kings County, New York, a fact that is evidenced by the CCB's own recommended list of Cannabinoid Hemp Retail Licensees.[21] *See* Declaration of Asaf Kampf, ¶ 3 dated February 14, 2024 ("Kampf Decl.").

72.     From January 2019 to February 2020, Asaf Kampf opened four stores, all located in New York: Hidden Hemp, Hidden Hemp on 7th Ave, Hemped NYC, and Hemped NYC on Orchard.  *Id.* at ¶ 3.

73.     Products for all four locations is stored and distributed from the Hidden Hemp store location ("Hidden Hemp Headquarters"). *Id.* at ¶ 4.

---

[21] https://cannabis.ny.gov/system/files/documents/2023/06/cannabinoid-hemp-retail-license-holders.pdf

74.    On March 22, 2023, Hidden Hemp Headquarters was subjected to an unauthorized and unconstitutional raid of its Brooklyn, New York retailer location, which resulted in over $150,000.00 worth of cannabinoid hemp products seized, despite Hidden Hemp Headquarters' complete compliance with the Prior Hemp Regulations. *Id.* at ¶¶ 5-17.

75.    Respondents, through their agents, employees or representatives, forced their way into Hidden Hemp's Headquarters, without a warrant nor probable cause, declaring themselves as New York Police Department officers.  Respondents then stated that they needed to conduct an inspection. *Id.* at ¶ 5.

76.    Over the course of the next thirty-six (36) hours, Respondents searched the entirety of the property, seizing the majority of Hidden Hemp Headquarters' products. *Id.* at ¶¶ 5-16.

77.    Three employees were working at the time Respondents arrived.  *Id.* at ¶ 6.  The employees were asked to step into the front of the store, where they were patted down and questioned regarding the operations of Hidden Hemp, as well as products sold. *Ibid.* During the raid, the employees were not allowed to make any telephone calls or use the restroom. *Ibid.*

78.    Over the three hours after the raid was initiated, Inspector Dawn Kelly called Mr. Kampf to advise him of the raid. *Id.* ¶ 7.

79.    Mr. Kampf immediately arrived at Hidden Hemp Headquarters, where he inquired as to the basis of the raid, given that all products sold by Hidden Hemp are compliant with Part 114 and the MRTA, but Respondents were unable to provide him with a reason. *Id.* at ¶ 8.

80.    Despite Mr.  Kampf's multiple requests, Respondents refused to provide any documentation showing their authorization to conduct the raid. *Id.* at ¶ 9.

81.     During the raid, Mr. Kampf complied with all Respondents' demands, including access to Hidden Hemps' products, books, licenses, and Certificates of Analysis ("COA"). *Id.* at ¶ 10.

82.     Respondents then advised Mr. Kampf they were taking legal possession of Hidden Hemp overnight. *Id.* at ¶ 11. They explained that the seized products would be tested and if they were determined to be legal, they would be returned to Hidden Hemp. *Ibid.*

83.     The following morning, upon his arrival at Hidden Hemp Headquarters, Mr. Kampf found that most of the products had been seized. *Id.* at ¶ 12. Respondents provided Mr. Kampf an inventory list of the seized products. *Id.* at ¶ 13. However, Mr. Kampf was not provided any information as to the location the products would be held nor a hearing date before a tribunal to challenge the seizure of the products. *Ibid.*

84.     Respondents seized of over thirty-nine (39) different cannabinoid hemp products totaling over $150,000.00, all of which were complaint with the MRTA, without any cognizable basis. *Id.* at ¶ 14.

85.     Of note, Respondents did not issue any violations whatsoever to Hidden Hemp. *Id.* at ¶ 15.

86.     Despite numerous requests from Mr. Kampf, Respondents have yet to return any of the products seized from Hidden Hemp Headquarters on March 22 and 23, 2023. *Id.* at ¶ 16. At this juncture, even with the return of product, the product would more than likely not be fit for sale due to the length of the time Respondents held the product and the lack of chain of custody, to include holding conditions, of the product. Without this information, product would not be fit for sale resulting in a total loss. *Ibid.*

87. Following the raid, Mr. Kamp spent approximately $80,000.00 to restock Hidden Hemp Headquarters. *Id.* at ¶ 17.

88. As a result of this raid, Hidden Hemp and its associated entities was crippled. *Id.* at ¶ 18. Hidden Hemp and its associated entities not only lost the seized products, but it also lost the profits it would have realized from the seized products, totaling approximately $500,000.00. *Ibid.*

89. Since the raid was conducted at Hidden Hem Headquarters, Mr. Kampf was unable to stock Hidden Hemp, Hidden Hemp on 7th Ave, Hemped NYC, and Hemped NYC on Orchard. *Id.* at ¶ 19.

90. Additionally, the raid damaged every store's reputation, leading to a decline in sales. *Id.* at ¶ 20.

91. As a result, Mr. Kampf was forced to close two of the stores. *Id.* at ¶ 21.

92. The termination of Hemped NYC on Orchard's lease agreement resulted in litigation, costing approximately $120,000.00. *Id.* at ¶ 22.

93. In total, Hidden Hemp, Hemped NYC, and Hemped NYC on Orchard incurred approximately $1,200,000.00 in losses as a result of Respondent's unlawful actions. *Id.* at ¶ 25.

**b. <u>OCM's Raids On The Green Room</u>**

94. The Green Room has been a duly licensed hemp retailer in New York County, New York since June 2021. *See* Declaration of Elliot Breslav, ¶ 3 dated March 1, 2024 ("Breslav Decl.").

95. In July 2023 and December 2023, The Green Room was subjected to unauthorized and unconstitutional raids of its West Village, New York retailer location which resulted in over $18,000.00 worth of cannabinoid hemp products seized, despite The Green Room's complete compliance with the Prior Hemp Regulations. *Id.* at ¶¶ 6, 10, 17, 21.

96.     In July 2023, without warning or notice, Respondents, through their agents, employees or representatives, responded to Smoke and CBD Outlet, which is located next to the Green Room's West Village location, and conducted a raid.  *Id.* at ¶ 6.

97.     When Respondents arrived, Mr. Breslav was in the shared basement area. *Id.* at ¶ 7. Respondents identified themselves as New York City Police Department Officers and questioned Mr. Breslav regarding the Green Room's affiliation with Smoke and CBD Outlet, to which he explained that the two stores shared a restroom in the basement, but that other than that they were not in any way affiliated.  *Ibid.*

98.     Notwithstanding this, and worse, notwithstanding that the officers did not possess a warrant to search the Green Room, several officers forced their way into The Green Room.  *Id.* at ¶ 8.

99.     Respondents questioned Mr. Breslav regarding the products, and requested all licenses and COAs, which he provided for their review. *Id.* at ¶ 9.

100.     Notwithstanding The Green Room's valid and up to date license, as well as COAs for all its products, Respondents unlawfully seized over $10,000.00 worth of products, consisting of lawful hemp products. *Id.* at ¶ 10.

101.     During the raid, Mr. Breslav called his attorney, Joshua S. Bauchner, Esq. Both Mr. Breslav and Mr. Bauchner requested that Respondents provide the authority under which they were seizing the products. *Id.* at ¶11

102.     An inspector acting on Respondents' behalf stated, "I don't know." *Ibid.*

103.     When asked how they were determining what products were illegal, an inspector acting on Respondents' behalf stated, "I don't know." *Id.* at ¶ 12.

104.    When asked under what authority they were seizing product, an inspector acting on Respondents' behalf again stated, "I don't know." *Id.* at ¶ 13.

105.    Respondents provided Mr. Breslav with an inventory list of the unlawfully seized products and told him they would advise of any violations at a later date. *Id.* at ¶ 14.

106.    Respondents did not provide any information as to the location the products would be held, whether the products would be returned, nor a hearing date before a tribunal to challenge the seizure of the products. *Id.* at ¶ 15.

107.    To date, The Green Room has yet to receive any notice of violations as a result of this raid.  *Id.* at ¶ 16.

108.    Following the raid, Mr. Breslav spent approximately $8,000.00 to restock the store. *Id.* at ¶ 17.

109.    The raid tarnished The Green Room's good reputation, which led to a substantial decline in sales. *Id.* at ¶ 18. As a result, Mr. Breslav was forced to permanently close The Green Room's East Village location. *Ibid.*

110.    In December 2023, The Green Room's West Village location was again unlawfully raided without a warrant. *Id.* at ¶ 19.

111.    Mr. Breslav was not present during the raid, but his employee called him upon Respondents entering the store. *Id.* at ¶ 20. Respondents, through their agents, employees or representatives, requested The Green Room's license and COAs, which the employee provided. *Ibid.*

112.    Upon their review, Respondents told Mr. Breslav that the store was compliant. *Id.* at ¶ 19. However, Respondents proceeded to seize The Green Room's products, including Delta-8, Delta-9, THCP, and pre-rolls. *Ibid.*

113.    Mr. Breslav again called Mr. Bauchner during the raid. *Id.* at ¶ 22. Both Mr. Breslav and Mr. Bauchner requested that Respondents provide the authority under which they were seizing the products, but Respondents were unable to provide a response. *Ibid.*

114.    Respondents unlawfully seized approximately $8,000.00 worth of products. *Id.* at ¶ 23.

115.    Respondents did not provide any information as to the location the products would be held, whether the products would be returned, nor a hearing date before a tribunal to challenge the seizure of the products. *Id.* at ¶ 24.

116.    To date, The Green Room has yet to receive any notice of violations as a result of this raid. *Id.* at ¶ 25.

117.    Respondents have yet to return any of the products seized from The Green Room in July 2023, and December 2023.  *Id.* at ¶ 26. At this juncture, even with the return of product, the product would more than likely not be fit for sale due to the length of the time Respondents held the product and the lack of chain of custody, to include holding conditions, of the product. *Ibid.* Without this information, product would not be fit for sale resulting in a total loss.  *Ibid.*

118.    As a result of this raid, Mr. Breslav was forced to permanently close The Green Room's West Village location as well. *Id.* at ¶ 27.

119.    Mr. Breslav incurred approximately $200,000.00 in losses as a result of Respondent's unlawful actions. *Id.* at ¶ 28.

c.    **OCM's Unlawful Conduct Harms Petitioners**

120.    Petitioner Cycling Frog is a Washington corporation. *See* Declaration of Dylan C. Summers, ¶3 dated February 14, 2024 ("Summers Decl."). Cycling Frog is a hemp beverage brand

that manufactures and sells hemp infused beverages in various jurisdictions, including in New York State. *Id*. at ¶ 8.

121.   In February 2023, Cycling Frog entered the New York market. *Id*. at ¶ 15.

122.   Cycling Frog's entry in the New York market was an immediate success. *Id.* at ¶16.  In less than six months, Cycling Frog generated $1.2 million in revenue and sold over 15,000 cases of hemp infused beverages across New York. *Ibid.*

123.   As a result of the Emergency Regulations and the Revised Regulations, Cycling Frog has lost a substantial amount of revenue totaling approximately $1 million dollars. *Id.* at ¶ 22.

124.   Petitioner Sarene Craft is a distributor of non-alcoholic hemp-derived beverages in New York State. *See* Declaration of Joseph Grabowski, ¶ 3 dated February 14, 2024 ("Grabowski Decl.").

125.   In the first forty-five (45) days of entering the hemp infused market, three percent of Sarene Craft's total sales stemmed from hemp infused beverages. *Id.* at ¶ 7. Over the next forty-five-day (45) period, Sarene Craft's sales of hemp infused beverages jumped to six percent. *Ibid.*

126.   Based on the high growth, Sarene Craft projected that the sale of hemp infused beverages would make up twenty-five (25) percent of its total sales for 2023. *Ibid.*

127.   Prior to the Emergency Regulations, Sarene Craft sold approximately 500 cases of beverages per week. *Id.* at ¶ 12. Since the implementation of the Emergency Regulations and the Revised Regulations, Petitioner sells approximately 15 cases of beverages per week. *Ibid.*

128.   To date, Sarene Craft has lost approximately $900,000 in revenue, which continues to accrue due to the Emergency Regulations and the Revised Regulations. *Id.* at ¶ 13.

129.    Sarene Craft's relationship with retailors has been negatively affected due to the Emergency Regulations and the Revised Regulations. *Id.* at ¶ 14.

130.    Moreover, Sarene Craft invested significant resources to sell hemp infused beverages. *Id.* at 3. Specifically, Sarene Craft obtained a Cannabinoid Hemp Retail License from OCM to distribute hemp infused beverages, ensured all retailer requirements under the Cannabis Law were satisfied, educated customers on Cannabis Law and the product itself to promote sales, rearranged its warehouses to house the new inventory, conducted product training for its employees, and incurred inventory purchasing costs, as well as customer acquisition costs. *Id.* at ¶ 11.

131.    Petitioner Raven's Landing has been a duly licensed hemp retailer in Nassau County, New York, since 2022. *See* Declaration of Michael Papazoglou, ¶ 3 dated February 14, 2024 ("Papazoglou Decl."). It has two locations, one in Long Beach, New York, and the second in Rockville Centre, New York. *Ibid.*

132.    In order to comply with the new regulations, Raven's Landing has been forced to remove over 80% of its products from shelves. *Id.* at ¶ 8.

133.    Due to the Emergency Regulations and the Revised Regulations, Raven's Landing was forced to substitute a large portion of its products to comply with the requirements that products be a 15:1 CBD to THC ratio. *Id.* at 13.

134.    As a result of the Emergency Regulations and the Revised Regulations, Raven's Landing has lost approximately $600,000. *Ibid.*

135.    Petitioner Gasko & Meyer began distributing hemp infused beverages in February 2023. *See* Declaration of Bruce Nober, ¶ 6 dated February 14, 2024 (Nober Decl.").

136.     Gasko & Meyer dedicated considerable resources to ensure its products were compliant with the Prior Hemp Regulations. *Id.* at ¶ 7.

137.     Before inception of the Emergency Regulations and the Revised Regulations, Gasko & Meyer sold approximately $70,000 worth of hemp infused beverages per week. *Id.* at ¶ 8.

138.     Due to the Emergency Regulations, Gasko & Meyer was forced to stop selling hemp infused beverages for approximately eleven weeks. *Id.* at ¶ 9.

139.     At its peak, proceeds from hemp infused beverages made up 20 percent of Gasko & Meyer's revenue. *Id.* at ¶ 10.

140.     Following the inception of the Emergency Regulations and the Revised Regulations, there was a decline in sales as customers believed it was too much of a risk to buy hemp infused beverages. *Id.* at ¶ 11.

141.     Gasko & Meyer was also unable to launch two products it had signed exclusive distribution agreements with due to the Revised Regulations. *Id.* at ¶ 12.

142.     Due to the Emergency Regulations and the Revised Regulations, Gasko & Meyer has lost over $770,000.00 in revenue. *Id.* at ¶ 13.

143.     Rebel Rabbit is a distributor of hemp infused seltzers. *See* Declaration of Pierce Wylie, ¶ 3 dated February 26, 2024 (Wylie Decl.").

144.     Following the Revised Regulations, there has been a complete halt in sales withing New York. *Id.* at ¶ 7, 9.

145.     Due to the Emergency Regulations and the Revised Regulations, Rebel Rabbit has lost over $220,000.00 in revenue. *Id.* at 9.

146.     Windy Hill has been a duly licensed hemp retailer in Washington County, New York since 2019, and has two locations, one in Greenwich, New York, and the second in Glens Falls, New York.  *See* Declaration of Holly Harris, ¶¶ 1, 3, 5 dated February 14, 2024 ("Harris Decl.").

147.     Respondents, through their employees, agents, or representatives conducted two inspections at Windy Hill.  *Id.* at ¶ 6.

148.     First, in or about February 2023, an OCM officer conducted an inspection at Windy Hill's Greenwich location.  *Ibid.*  The OCM Officer inspected the entire store, checking all the products, as well as reviewing the license and COAs.  *Ibid.*  The Officer then left without incident.  *Id.* at ¶ 7.

149.     Windy Hill did not receive a notice of violations following the inspection.  *Ibid.*

150.     Then, in August 2023, approximately thirty (30) officers from OCM, Department of Taxation and Finance, and the local sheriff's office entered the Glens Falls location and shut the store down.  *Id.* at 3.  Respondents advised Holly Harris that they would be conducting an inspection, though it was clearly a raid without warning or notice.  Although requested, no warrant was provided.. *Id.* at ¶ 8.

151.     Respondents proceeded to question Ms. Harris regarding all products and reviewed Windy Hill's license and COAs. *Id.* at ¶ 9.

152.     During the inspection, there were several uniformed officers both inside and outside the store. *Id.* at ¶ 10.

153.     Customers who encountered Respondents, took pictures of the officers at the store, which were then posted on Facebook with the caption "Cops are busting the Windy Hill CBD and Wellness Company in GF." *Id.* at ¶ 11.

154.   The inspections conducted by Respondents damaged Windy Hill's reputation resulting in a decline in sales. *Id.* at ¶ 14.

155.   Windy Hill did not receive a notice of violations following the inspection. *Id.* at ¶13.

156.   Due to the Emergency Regulations and the Revised Regulations, Windy Hill has lost about $65,000 in revenue. *Id.* at ¶14.

### FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 – VIOLATION OF FOURTH AMENDMENT RIGHTS AS TO HIDDEN HEMP

157.   Petitioners repeat and reallege the allegations contained in Paragraphs 1 to 148 as if fully set forth herein.

158.   Respondents acted under the color of the law through the duties and powers specified in the MRTA.

159.   The Fourth Amendment of the United States Constitution protects from unreasonable searches and seizures by the government.

160.   Respondents acted under the color of law when they infringed upon Petitioner Hidden Hemp's Fourth Amendment rights by *inter alia*:

a.   Authorizing agents of Respondents to enter Hidden Hemp's retailer location, declaring themselves officers with "New York Police Department" on March 22, 2023, without consent and without a warrant.

b.   Expelling employees, agents, and representatives of Hidden Hemp from its retailer location for over thirty-six (36) hours.

c.  Refusing Asaf Kampf, owner of Hidden Hemp, reasonable access to Hidden Hemp's retailer location.

d.  Refusing Asaf Kampf, owner of Hidden Hemp, any articulable basis for Respondents' occupation, inspection, or otherwise raid of its retailer location.

e.  Respondents' seizure of over thirty-nine (39) different cannabinoid hemp products totaling over $150,000.00, all of which were compliant with the MRTA, without any cognizable basis.

f.  Respondents' continued failure to inform Hidden Hemp of the location of its inventory, the status of any pending testing or investigation to confirm Hidden Hemp's compliance with the Prior Hemp Regulations, or whether Hidden Hemp can anticipate an administrative hearing concerning the status of its products - let alone its hemp retailer license.

161.  Respondents, without notice to Hidden Hemp and without legal justification acted to occupy Hidden Hemp's licensed cannabinoid hemp retailer location, and seized over $150,000.00 worth of product.

162.  Upon information and belief, Respondents' actions in this regard were not legally justified but were arbitrary, capricious, and politically motivated as a means to crack down on New York State's rampant illegal cannabis and hemp retail market.  Respondents have acted with deliberate indifference to the Fourth Amendment rights of Hidden Lamp.

163.  Respondents selectively enforced the MRTA against Hidden Hemp, failed to provide proper notice of its seizure of over $150,000.00 worth of cannabinoid hemp products, and failed to provide Hidden Hemp a reasonable opportunity to be heard on the status of its inventory.

164.    The Respondents have stripped Hidden Hemp of its rights against unlawful and unreasonable search and seizure guaranteed under the Fourth Amendment of the Constitution of the United States.  As a direct and proximate result of the acts and omissions of each of the Respondents, Hidden Hemp's rights have been violated.

165.    Petitioner Hidden Hemp seeks an order pursuant to 42 U.S.C. § 1893 enjoining the Respondents from perpetuating their unconstitutional enforcement of the MRTA, compelling Respondents to provide Hidden Hemp a reasonable opportunity for an administrative hearing concerning the status of its inventory, and awarding Petitioner Hidden Hemp compensatory damages in the amount of $800,000.00, punitive damages and attorney's fees.

166.    Hidden Hemp has no adequate remedy at law and will suffer serious and irreparable harm to its constitutional rights unless Respondents are enjoined from continuing to enforce the unlawful regulations as aforesaid.

167.    In light of the above, the Petitioners are entitled to compensation for Respondents' violation their Fourth Amendment rights via 42 USC 1983.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 – VIOLATION OF FOURTH AMENDMENT RIGHTS
### AS TO THE GREEN ROOM

168.    Petitioners repeat and reallege the allegations contained in Paragraphs 1 to 159 as if fully set forth herein.

169.    Respondents acted under the color of the law through the duties and powers specified in the MRTA.

170.    The Fourth Amendment of the United States Constitution protects from unreasonable searches and seizures by the government.

171. Respondents acted under the color of law when they infringed upon Petitioner The Green Room's Fourth Amendment rights by *inter alia*:

g. Authorizing agents of Respondents to enter The Green Room's retailer location, in July 2023 and December 2023, without consent and without a warrant.

h. Refusing Elliot Breslav, owner of The Green Room, any articulable basis for Respondents' occupation, inspection, or otherwise raid of its retailer location.

i. Respondents' seizure of cannabinoid hemp products totaling over $18,000.00, all of which were complaint with the MRTA, without any cognizable basis.

j. Respondents' continued failure to inform Elliot Breslav, owner of The Green Room, of the location of its inventory, the status of any pending testing or investigation to confirm The Green Room's compliance with the Hemp Regulations, or whether The Green Room can anticipate an administrative hearing concerning the status of its products - let alone its hemp retailer license.

172. Respondents, without notice to The Green Room and without legal justification acted to occupy The Green Room's licensed cannabinoid hemp retailer location on two different occasions and seized over $18,000.00 worth of product.

173. Upon information and belief, Respondents' actions in this regard were not legally justified but were arbitrary, capricious, and politically motivated as a means to crack down on New York State's rampant illegal cannabis and hemp retail market. Respondents have acted with deliberate indifference to the Fourth Amendment rights of The Green Room.

174. Respondents selectively enforced the MRTA against The Green Room, failed to provide proper notice of its seizure of over $18,000.00 worth of cannabinoid hemp products, and

failed to provide The Green Room a reasonable opportunity to be heard on the status of its inventory.

175.    The Respondents have stripped The Green Room of its rights against unlawful and unreasonable search and seizure guaranteed under the Fourth Amendment of the Constitution of the United States.   As a direct and proximate result of the acts and omissions of each of the Respondents, The Green Room's rights have been violated.

176.    Petitioner The Green Room seeks an order pursuant to 42 U.S.C. § 1893 enjoining the Respondents from perpetuating their unconstitutional enforcement of the MRTA, compelling Respondents to provide The Green Room a reasonable opportunity for an administrative hearing concerning the status of its inventory and awarding Petitioner, The Green Room, compensatory damages in the amount of $200,000.00, punitive damages and attorney's fees.

177.    The Green Room has no adequate remedy at law and will suffer serious and irreparable harm to its constitutional rights unless Respondents are enjoined from continuing to enforce the unlawful regulations as aforesaid.

178.    In light of the above, the Petitioners are entitled to compensation for Respondents' violation their Fourth Amendment rights via 42 USC 1983.

<u>**THIRD CAUSE OF ACTION**</u>
**42 U.S.C. § 1983 – VIOLATIONS OF FIFTH AMENDMENT AS TO ALL PETITIONERS**

179.    Petitioners repeat and reallege the allegations contained in Paragraphs 1 to 170 as if fully set forth herein.

180.    As stated above, Respondents, without notice to Petitioners and without legal justification unconstitutionally under the color of the law through the duties and powers specified in the MRTA.

181.    Under the Fifth Amendment's Takings Clause, the Constitution of the United States prohibits the government from taking private property without just compensation.

182.    As stated above, Respondents, without notice and without legal justification passed the Emergency Regulations where no such emergency has been alleged with any factual or evidentiary basis, forcing Petitioners to pull almost all cannabinoid hemp products from their shelves and effectively close their doors.

183.    Moreover, Respondents, without legal justification passed the Revised Regulations where no factual evidentiary basis was provided, forcing Petitioners to pull almost all cannabinoid hemp products from their shelves and effectively close their doors.

184.    Upon information and belief, Respondents' actions in this regard were not legally justified but were arbitrary, capricious, and politically motivated.

185.    The Respondents selectively enforced the MRTA against Petitioners, failed to provide proper notice or justification for the changes to the Prior Hemp Regulations in violation of Section 13 of the MRTA and Section 202(6) of the APA.

186.    The Respondents' actions have been inequitable towards Petitioners.

187.    The Respondents have deprived Petitioners of the substantive and procedural due process rights guaranteed by the Fifth Amendment of the Constitution of the United States.

188.    Petitioners have no adequate remedy at law and will suffer serious and irreparable harm to its constitutional rights unless Respondents are enjoined from continuing to enforce the unlawful regulations as aforesaid.

189.    Petitioners seeks an order pursuant to 42 U.S.C. § 1893 enjoining the Respondents from perpetuating their unconstitutional enforcement of the Revised Regulations dated November 17, 2023.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – VIOLATIONS OF FOURTEENTH AMENDMENT**
**AS TO ALL PETITIONERS**

190.     Petitioners repeat and reallege the allegations contained in Paragraphs 1 to 182 as if fully set forth herein.

191.     As stated above, Respondents, without notice to Petitioners and without legal justification unconstitutionally under the color of the law through the duties and powers specified in the MRTA.

192.     Under the Fourteenth Amendment, the Constitution of the United States prohibits the State government from violating Petitioner's Fourth and Fifth Amendment rights.

193.     As stated above, Respondents, without notice to Petitioners and without legal justification unconstitutionally under the color of the law through the duties and powers specified in the MRTA., passed the Emergency Regulations where no such emergency has been alleged with any factual or evidentiary basis, forcing Petitioners to pull almost all cannabinoid hemp products from their shelves and effectively close their doors.

194.     Further, Respondents, without legal justification passed the Revised Regulations where no factual evidentiary basis was provided, forcing Petitioners to pull almost all cannabinoid hemp products from their shelves and effectively close their doors.

195.     Upon information and belief, Respondents' actions in this regard were not legally justified but were arbitrary, capricious, and politically motivated. Respondents have acted with deliberate indifference to the Fourth Amendment rights of Petitioners.

196.     The Respondents have deprived Petitioners of the substantive and procedural due process rights guaranteed by the Fourteenth Amendment of the Constitution of the United States.

As a direct and proximate result of the acts and omissions of each of the Respondents, Petitioners'

rights have been violated.

197.    Petitioners seeks relief pursuant to 42 U.S.C. § 1893 based on Respondents'

unconstitutional enforcement of the MRTA.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – VIOLATIONS CIVIL RIGHTS – DELIBERATE INDIFFERENCE**
**AND/OR FAILURE TO TRAIN AS TO ALL PETITIONERS**

198.    Petitioners repeat and reallege the allegations contained in Paragraphs 1 to 190 as

if fully set forth herein.

199.    In committing the violations as stated above, Respondents acted under the color of

state law and with deliberate indifference to Petitioners' Fourth, Fifth, and Fourteenth Amendment

rights.

200.    Respondents failed to provide adequate education and training for officers to

distinguish marijuana from legal hemp.

201.    Even when Petitioners showed Respondents' officers Certificates of Analysis for

their products, the officers ignored them and proceeded to seize the products. Kampf Decl. at ¶ 10;

Breslav Decl. at ¶ 9.

202.    The failure of Respondents to train their officers is the direct and proximate cause

of Petitioners' damages procured by the above warrantless searches and seizures. Had the officers

been properly trained, Petitioners' Constitutional rights would not have been violated.

**SIXTH CAUSE OF ACTION**

**42 U.S.C. § 1983 – CONSPIRACY TO VIOLATE PETITIONERS' CONSTITUTIONAL RIGHTS TO BE FREE FROM UNLAWFUL SEARCH AND SEIZURE AND UNLAWFUL PROSECUTION AS TO HIDDEN HEMP AND THE GREEN ROOM**

203.    Petitioners repeat and reallege the allegations contained in Paragraphs 1 to 193 as if fully set forth herein

204.    Upon information and belief, Respondents took part in a conspiracy to violate Petitioners' Constitutional Rights.

205.    Governor Hochul granted the OCM additional powers to "conduct regulatory inspections of businesses selling cannabis," however, Respondents conspired to use this power to unlawfully search and seize Petitioners' hemp products.

206.    When Respondents conducted raids and seizures in March 2023, July 2023, and December 2023 they acted in furtherance of the conspiracy to violate Petitioners' constitutional rights.

Dated:  March 1, 2024

<div style="margin-left: 40%">

MANDELBAUM BARRETT PC
Attorneys for Petitioners


By:    _____
JOSHUA S. BAUCHNER, ESQ.
JED M. WEISS, ESQ.
570 Lexington Avenue, 21st Floor
New York, New York 10022

</div>