UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAVEN'S LANDING d/b/a DR. NATURE RX, LLC, HEMPED NYC, LLC, HIDDEN HEMP CORP., HEMPED NYC ON ORCHARD, LLC, GASKO & MEYER INC., SARENE CRAFT BEER DISTRIBUTORS, WINDY HILL 312 LLC d/b/a WINDY HILL CBD, NORTH FORK DISTRIBUTION, INC, d/b/a CYCLING FROG LLC, AND THE GREEN ROOM, REBEL RABBIT<br><br>                            Petitioners,<br><br>v.<br><br>NEW YORK STATE CANNABIS CONTROL BOARD, NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT, TREMAINE WRIGHT, in her official capacity as the Chairwoman of the New York State Cannabis Control Board, and CHRIS ALEXANDER, in his official capacity as Executive Director of the New York State Office of Cannabis Management,<br><br>                            Respondent(s). | **Index No:** 24-CV-01581 (MKV) (BCM) |

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION FOR A PRELIMINARY INJUNCTION

Joshua S. Bauchner, Esq.
Jed M. Weiss, Esq.
**MANDELBAUM BARRETT PC**
570 Lexington Avenue, 21st Floor
New York, NY 10022
Tel.: 646-369-0250
Fax: 973-325-7467
Email: Jbauchner@mblawfirm.com
          Jweiss@mblawfirm.com
*Attorneys for Petitioners*

**INTRODUCTION**

Petitioners RAVEN'S LANDING, LLC d/b/a Dr. Nature RX ("Raven's Landing"), HEMPED NYC, LLC ("Hemped NYC"), HIDDEN HEMP CORP. ("Hidden Hemp"), HEMPED NYC ON ORCHARD, LLC ("Hemped Orchard"), GASKO & MEYER INC., SARENE CRAFT BEER DISTRIBUTORS, WINDY HILL 312 LLC d/b/a WINDY HILL CBD, NORTH FORK DISTRIBUTION, INC, d/b/a CYCLING FROG, LLC, THE GREEN ROOM, AND REBEL RABBIT (hereinafter collectively, "Petitioners"), by and through their attorneys, Mandelbaum Barrett PC, hereby apply for an order to show cause why a preliminary injunction should be issued to prevent Respondents NEW YORK STATE CANNABIS CONTROL BOARD ("CCB"), NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT ("OCM"), TREMAINE WRIGHT in her official capacity as the Chairwoman of the CCB ("Wright") and CHRIS ALEXANDER, in his official capacity as Executive Director of the New York State OCM ("Alexander") (hereinafter collectively, "Respondents"), from enforcing the November 17, 2023, revised regulations and raiding duly licensed hemp stores.

Petitioners ask this Court to enjoin Respondents from their knowing, voluntary, and continuing violations of Petitioners' Fourth, Fifth, and Fourteenth Amendment Constitutional rights. Petitioners seek preliminarily relief to prevent Respondents from implementing and enforcing the regulations amending 9 NYCRR § 114, which were adopted on November 17, 2023 (the "Revised Regulations"), after a New York State Court deemed unlawful and enjoined enforcement of similar emergency regulations amending 9 NYCRR § 114, which were adopted on July 19, 2023 (the "Emergency Regulations"). Furthermore, Petitioners ask the Court to enjoin Respondents from conducting unreasonable searches and seizures in violation of Petitioners' Fourth Amendment rights.

## PRELIMINARY STATEMENT

Petitioners are a group of small businesses whose livelihoods depend on the sale of a niche product that is growing in popularity. Petitioners sell products that contain hemp, a variety of Cannabis sativa that has been cultivated for its fiber and does not produce psychoactive effects. While associated with Cannabis, most strains of hemp have none of the psychoactive effects associated with the use Cannabis, rather it has many nutritional benefits.[1] Indeed, hemp has been a source of nutrition for hundreds of years. There are significant benefits associated with hemp including a reduced risk of heart disease, improved digestion on account of the significant omega-3 fatty acids contained in hemp, and even topical hemp which is used to treat Eczema.

Seeking to take advantage of its growing popularity, Petitioners endeavored to manufacture and distribute products containing hemp to the public. But as is too often the case, Respondents, lacking the knowledge regarding the distinction between hemp and Cannabis, got in the way. First, Respondent, OCM, adopted an "emergency" regulation (there was no emergency) prohibiting the sale of products containing hemp that exceed a 3:1 CBD to THC ratio. While seemingly benign on its face, the impact of the "emergency" regulation was nothing short of devastating to the small businesses that manufacture and distribute hemp products because the levels mandated by the OCM effectively meant any product containing hemp is suddenly and inexplicably illegal. The

---

[1]   *Adherence, Safety, and Effectiveness of Medical Cannabis and Epidemiological Characteristics of the Patient Population: A Prospective Study*, https://www.frontiersin.org/articles/10.3389/fmed.2022.827849/full; *safety and Toxicology of Cannabinoids*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4604177/; *An Update on safety and Side Effects of Cannabidiol: A Review of Clinical Data and Relevant Animal Studies*; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5569602/; *Delta-9 tetrahydrocannabinol and Cannabidiol: Separating the Chemicals from the "weed," a pharmacodynamic discussion*; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6007535/; *How to Dose THC: How Much Is Too Much?*, https://takomawellness.com/how-much-cannabis-is-too-much-cannabis/.

fact is that all hemp containing products exceeded the OCM's arbitrary threshold, and therefore were suddenly prohibited from sale without warning or reason.

Thankfully, on November 9, 2023, the Supreme Court of the State of New York (Albany County) stepped in to remedy this egregious regulatory overreach and entered an order prohibiting the OCM from enforcing its "emergency" regulations. As set forth in greater detail in the Verified Petition (the "Petition"), in striking the so-called emergent nature of the regulations, the State Court cited the embarrassing lack of support purporting to support the "emergency" regulation, and the arbitrary and capricious nature of its adoption. Acknowledging that it is axiomatic that the Government is, of course, allowed to govern, the Court still struck the emergency regulations finding that the Government failed to "cite evidence or studies to substantiate that New Yorkers have either been misled or harmed by hemp infused products".

Respondents, however, were undeterred. Now, instead of adopting the restrictions under the auspices of an "emergency," Respondents adopted (and are now enforcing) the exact same arbitrary and capricious guidelines lacking any support in science previously rejected by the Court; though this time through a different process. The result, however, and the impact on the small businesses that manufacture and sell products containing hemp, is the same. Petitioners simply cannot sell their products, thus, losing a highly lucrative income stream that the public desires and has no link whatsoever to the psychoactive effects of Cannabis. To make matters worse, Respondents are abusing the meritless regulations to raid Petitioners' facilities and confiscate their products in blatant violation of Petitioners' Constitutional rights.

The Court must now again intervene. Respondents cannot be permitted to adopt arbitrary and capricious guidelines and then bully their way into law abiding small businesses at their whim.

Constitutional safeguards prohibit Respondents from doing so, and this litigation is being brought to redress the harm caused due to misinformation and bureaucracy.

For these and the reasons set forth in greater detail below, Petitioners respectfully request an immediate halt to the enforcement of the Revised Regulations and the unconstitutional search and seizures of Petitioners' property.

**I.       STATEMENT OF FACTS**

For a true and accurate restoration of the facts we respectfully direct the Court to the Petition.

**II.      LEGAL STANDARD**

In order to secure a Preliminary Injunction, the petitioner must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm without a preliminary injunction; (3) the balance of equities favors the plaintiff; and (4) the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Gov't Emps. Ins. Co. v. Relief Med., P.C.*, 554 F. Supp. 3d 482, 498 (E.D.N.Y. 2021).

**III.     PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS**

   **A.    The Revised Regulations Fail on Their Face**

Petitioners are likely to succeed on the merits because they already have.  As previously stated, the Revised Regulations are based on the same "justifications" as the Emergency Regulations, which the Supreme Court found were not justified.  *North Fork Distributions, Inc. et al. v. New York State Cannabis Control Board*, 203 N.Y.3d 496 (Sup. Ct. 2023), provides this Court with a roadmap to Petitioner's likelihood of success.  The Court took great pains to analyze the supposed "rationale" behind the Emergency Regulations, and in so doing, found there was none.  Since nothing has changed, that decision should not be disturbed.

In adopting the Emergency Regulations, the State argued (or at least attempted to) that: "Intoxicating cannabinoid hemp products frequently mislead consumers to believe that product contains very little, or no THC, when in fact the finished product could contain intoxicating levels of THC . . . it can result in hospitalization and in very rare cases, death." *Id.* at 3.  Thankfully the Supreme Court took a closer look ("a sincere scrutiny of the Emergency Justification is required"), and utterly disagreed.

The Court held, in pertinent part:

> The Emergency Justification fails to cite evidence or studies to substantiate that New Yorkers have either been mislead or harmed by hemp infused products.  The Emergency Justification also fails to cite facts showing New Yorkers have either overconsumed or accidentally ingested intoxicating levels of THC. … ***It sets forth harm in conclusory fashion – and that is not good enough to shirk the burden the Legislature imposed upon respondents***.

*Id.* at 6 (emphasis added).

When the State realized it failed to justify the Emergency Regulations at the outset of their adoption, it submitted what it considered "evidence" to the Supreme Court that never appeared in the State's "justification statement." *Ibid.*  Although unnecessary to consider because of the State's procedural failings, the Court still did so, and ***still determined the State was wrong***.  The Court held:

> Respondents' submissions cite to several anecdotes about harm caused by cannabinoid hemp products ***but offer no studies or statistics concerning present dangers of products like petitioners***. … respondents have at best only reasonably forecasted the potential for trouble; the potential that "bad things [might or could be] happening. … **Thus, the court concludes that petitioners are likely to prevail on their claim and have clearly and convincingly satisfied the merits prong of the preliminary injunction test**.

*Id.* at 6 (emphasis added).

6

Thus, it has already been determined that on their face, the Revised Regulations fail, and Petitioners are likely to succeed.

### B. The Revised Regulations Violate Petitioners' Fifth and Fourteenth Amendment Rights

Under the Fifth Amendment's Taking Clause, the Constitution of the United States prohibits the government from taking private property without just compensation. *U.S. Const. amends. V, XIV, § 1*; *Cmty. Hous. Improvement Program v. City of New York,* 59 F.4th 540, 550 (2d Cir. 2023). "That requirement applies to all physical appropriations of property by the government." *Ibid.* (citing *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015)). Moreover, "when the government effects a physical appropriation of private property for itself or another—whether by law, regulation, or another means—a per se physical taking has occurred." *Ibid.* (citing *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021)). For example, a physical taking can be the taking of possession of property without taking title to it. *Ibid.* (citing *United States v. Pewee Coal Co.*, 341 U.S. 114, 115–17 (1951)).

Caselaw has often described those kinds of takings as restrictions that go "too far" and label them as "regulatory takings." *Cedar Point Nursey*, 594 U.S. at 149 (citing *Horne,* 576 U.S. at 360; *Yee v. Escondido*, 503 U.S. 519, 527 (1992)). The Supreme Court of the United States has stressed that "Government action that . . . appropriates property is no less a physical taking because it arises from a regulation." *Ibid.* (citing *Horne*, 576 U.S. at 361). The question for the Court is "whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Ibid.* (citing *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (2002)).

As stated in the Petition, Respondents, without any legal or factual justification adopted the Revised Regulations where no factual evidentiary basis was provided, forcing Petitioners to

pull almost all cannabinoid hemp products from their shelves and effectively close their doors. Respondents' actions in this regard were not legally justified but were arbitrary, capricious, and politically motivated.

The Respondents selectively enforced the Marihuana Regulation and Taxation Act ("MRTA") against Petitioners and failed to provide proper notice or justification for the changes to the Hemp Regulations in violation of Section 13 of the MRTA and Section 202(6) of the APA. Thus, Respondents deprived Petitioners of the substantive and procedural due process rights guaranteed by the Fifth Amendment of the Constitution of the United States.

### C.  The Respondents Raids Unquestionably Violates Petitioners' Fourth and Fourteenth Amendment Rights

The Fourth Amendment protects the right to "be free from unreasonable searches and seizures." *Ahlers v. Rabinowitz*, 684 F.3d 53, 61 (2d Cir. 2012). To conduct a search, a warrant based on probable cause is usually required. *Aiken v. Nixon*, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002), *aff'd*, 80 Fed. Appx. 146 (2d Cir. 2003).

Respondents unlawfully searched and seized Petitioners' property without a warrant. Nor did they have an articulable basis for Respondents' occupation, inspection, or raid of certain Petitioners' retail locations.

On March 22, 2023, Hidden Hemp was subjected to an unauthorized and unconstitutional raid of its Brooklyn, New York retail location. *See* Declaration of Asaf Kampf ¶¶ 5-14, dated February 14, 2024 ("Kamp Decl."). Despite Mr. Kampf's multiple requests, Respondents refused to provide any documentation showing their authorization to conduct the raid, seize product, and otherwise interfere with Hidden Hemp's normal business operations. *Id.* at ¶ 9. Respondents then seized over thirty-nine (39) different cannabinoid hemp products totaling over $150,000.00, all of which were complaint with the MRTA, without any cognizable basis. *Id.* at ¶ 14. To date,

no notice of hearing has been issued and, upon information and belief, the unlawfully seized product was destroyed.

In July 2023 and December 2023, The Green Room was subjected to unauthorized and unconstitutional raids of its West Village, New York retailer location which resulted in over $18,000.00 worth of cannabinoid hemp products seized, despite The Green Room's complete compliance with the Prior Hemp Regulations.  See Declaration of Elliot Breslav, ¶¶ 3, 6, 10, 17, 21dated March 1, 2024 ("Breslav Decl.").  In July 2023, without warning or notice, Respondents, through their agents, employees or representatives, responded to Smoke and CBD Outlet, which is located next to the Green Room's West Village location, and conducted a raid.  *Id*. at ¶ 6.

When Respondents arrived, Mr. Breslav was in the shared basement area. *Id*. at ¶ 7. Respondents identified themselves as New York City Police Department Officers and questioned Mr. Breslav regarding the Green Room's affiliation with Smoke and CBD Outlet, to which he explained that the two stores shared a restroom in the basement, but that other than that they were not in any way affiliated.  *Ibid*.  Notwithstanding this, and worse, notwithstanding that the officers did not possess a warrant to search the Green Room, several officers forced their way into The Green Room.  *Id*. at ¶ 8.

Respondents questioned Mr. Breslav regarding the products, and requested all licenses and COAs, which he provided for their review. *Id*. at ¶ 9. Notwithstanding The Green Room's valid and up to date license, as well as COAs for all its products, Respondents unlawfully seized over $10,000.00 worth of products, consisting of lawful hemp products. *Id*. at ¶ 10.

During the raid, Mr. Breslav called his attorney, Joshua S. Bauchner, Esq.  Both Mr. Breslav and Mr. Bauchner requested that Respondents provide the authority under which they were seizing the products.  An inspector acting on Respondents' behalf stated, "I don't know." *Id*. at

9

¶11. When asked how they were determining what products were illegal, an inspector acting on Respondents' behalf stated, "I don't know." *Id.* at ¶ 12. When asked under what authority they were seizing product, an inspector acting on Respondents' behalf again stated, "I don't know." *Id.* at ¶ 13. Respondents provided Mr. Breslav with an inventory list of the unlawfully seized products and told him they would advise of any violations at a later date. *Id.* at ¶ 14. Respondents did not provide any information as to the location the products would be held, whether the products would be returned, nor a hearing date before a tribunal to challenge the seizure of the products. *Id.* at ¶ 15. To date, The Green Room has yet to receive any notice of violations as a result of this raid. *Id.* at ¶ 16.

Following the raid, Mr. Breslav spent approximately $8,000.00 to restock the store. *Id.* at ¶ 17. The raid tarnished The Green Room's good reputation, which led to a substantial decline in sales. *Id.* at ¶ 18. As a result, Mr. Breslav was forced to permanently close The Green Room's East Village location. *Ibid*.

In December 2023, The Green Room's West Village location was again unlawfully raided without a warrant. *Id.* at ¶ 19. Mr. Breslav was not present during the raid, but his employee called him upon Respondents entering the store. *Id.* at ¶ 18. Respondents, through their agents, employees or representatives, requested The Green Room's license and COAs, which the employee provided. *Ibid*. Upon their review, Respondents told Mr. Breslav that the store was compliant. *Id.* at ¶ 21. However, Respondents proceeded to seize The Green Room's products, including Delta-8, Delta-9, THCP, and pre-rolls. *Ibid*.

Mr. Breslav again called Mr. Bauchner during the raid. *Id.* at ¶ 22. Both Mr. Breslav and Mr. Bauchner requested that Respondents provide the authority under which they were seizing the products, but Respondents were unable to provide a response. *Ibid*. Respondents unlawfully

seized approximately $8,000.00 worth of products. *Id*. at ¶ 23. Respondents did not provide any information as to the location the products would be held, whether the products would be returned, nor a hearing date before a tribunal to challenge the seizure of the products. *Id*. at ¶ 24. To date, The Green Room has yet to receive any notice of violations as a result of this raid. *Id*. at ¶ 25.

Respondents have yet to return any of the products seized from The Green Room in July 2023, and December 2023. *Id*. at ¶ 26. At this juncture, even with the return of product, the product would more than likely not be fit for sale due to the length of the time Respondents held the product and the lack of chain of custody, to include holding conditions, of the product. Ibid. Without this information, product would not be fit for sale resulting in a total loss. *Ibid*. As a result of this raid, Mr. Breslav was forced to permanently close The Green Room's West Village location as well. *Id*. at ¶ 27. Mr. Breslav incurred approximately $200,000.00 in losses as a result of Respondent's unlawful actions. *Id*. at ¶ 28.

On March 22, 2023, Hidden Hemp Headquarters was subjected to an unauthorized and unconstitutional raid of its Brooklyn, New York retailer location, which resulted in over $150,000.00 worth of cannabinoid hemp products seized, despite Hidden Hemp Headquarters' complete compliance with the Prior Hemp Regulations. *Id*. at ¶¶ 5-17. Respondents, through their agents, employees or representatives, forced their way into Hidden Hemp's Headquarters, without a warrant nor probable cause, declaring themselves as New York Police Department officers. Respondents then stated that they needed to conduct an inspection. *Id*. at ¶ 5.

Over the course of the next thirty-six (36) hours, Respondents searched the entirety of the property, seizing the majority of Hidden Hemp Headquarters' products. *Id*. at ¶¶ 5-16. Three employees were working at the time Respondents arrived. *Id*. at ¶ 6. The employees

11

were asked to step into the front of the store, where they were patted down and questioned regarding the operations of Hidden Hemp, as well as products sold. *Ibid*. During the raid, the employees were not allowed to make any telephone calls or use the restroom. *Ibid*.

Over the three hours after the raid was initiated, Inspector Dawn Kelly called Mr. Kampf to advise him of the raid. *Id*. ¶ 7. Mr. Kampf immediately arrived at Hidden Hemp Headquarters, where he inquired as to the basis of the raid, given that all products sold by Hidden Hemp are compliant with Part 114 and the MRTA, but Respondents were unable to provide him with a reason. *Id*. at ¶ 8. Despite Mr. Kampf's multiple requests, Respondents refused to provide any documentation showing their authorization to conduct the raid. *Id*. at ¶ 9.

During the raid, Mr. Kampf complied with all Respondents' demands, including access to Hidden Hemps' products, books, licenses, and Certificates of Analysis ("COA"). *Id*. at ¶ 10. Respondents then advised Mr. Kampf they were taking legal possession of Hidden Hemp overnight. *Id*. at ¶ 11. They explained that the seized products would be tested and if they were determined to be legal, they would be returned to Hidden Hemp. Ibid.

The following morning, upon his arrival at Hidden Hemp Headquarters, Mr. Kampf found that most of the products had been seized. *Id*. at ¶ 12. Respondents provided Mr. Kampf an inventory list of the seized products. *Id*. at ¶ 13. However, Mr. Kampf was not provided any information as to the location the products would be held nor a hearing date before a tribunal to challenge the seizure of the products. *Ibid*. Respondents seized of over thirty-nine (39) different cannabinoid hemp products totaling over $150,000.00, all of which were complaint with the MRTA, without any cognizable basis. *Id*. at ¶ 14. Respondents did not issue any violations whatsoever to Hidden Hemp. *Id*. at ¶ 15.

Despite numerous requests from Mr. Kampf, Respondents have yet to return any of the products seized from Hidden Hemp Headquarters on March 22 and 23, 2023. *Id*. at ¶ 16. At this juncture, even with the return of product, the product would more than likely not be fit for sale due to the length of the time Respondents held the product and the lack of chain of custody, to include holding conditions, of the product. Without this information, product would not be fit for sale resulting in a total loss. *Ibid*.

Following the raid, Mr. Kamp spent approximately $80,000.00 to restock Hidden Hemp Headquarters. *Id*. at ¶ 17. As a result of the raid, Hidden Hemp and its associated entities was crippled. *Id*. at ¶ 18. Hidden Hemp and its associated entities not only lost the seized products, but it also lost the profits it would have realized from the seized products, totaling approximately $500,000.00. *Ibid*. Since the raid was conducted at Hidden Hem Headquarters, Mr. Kampf was unable to stock Hidden Hemp, Hidden Hemp on 7th Ave, Hemped NYC, and Hemped NYC on Orchard. *Id*. at ¶ 19. Additionally, the raid damaged every store's reputation, leading to a decline in sales. *Id*. at ¶ 20.

As a result, Mr. Kampf was forced to close two of the stores. *Id*. at ¶ 21. The termination of Hemped NYC on Orchard's lease agreement resulted in litigation, costing approximately $120,000.00. *Id*. at ¶ 22. In total, Hidden Hemp, Hemped NYC, and Hemped NYC on Orchard incurred approximately $1,200,000.00 in losses as a result of Respondent's unlawful actions. *Id*. at ¶ 25

***These raids unquestionably give rise to constitutional violations, particularly where products that were seized were in complete compliance with the law***.

The Sixth Circuit Court of Appeals recently was presented with a similar fact pattern and determined that raiding cannabinoid manufactures and distributors where they were in compliance

13

with the law unquestionably constitutes a predicate for a constitutional violation. *James Swain Rieves v. Town of Smyrna, Tennessee, et al.*, 67 F.4th 856 (6th Cir. 2023). In *James Swain Rieves v. Town of Smyrna, Tennessee, et al.*, the Sixth Circuit was asked to determine whether a §1983 civil conspiracy was properly plead in instances where raids (dubbed "Operation Candy Crush") were conducted on stores selling products that were entirely compliant with the law. 67 F.4th at 862. In reversing the District Court's dismissal, the Court cited language used by law enforcement eerily similar to that used by the State to "justify" the Revised Regulations, and similarly without support, to wit: "the seized products contained an illegal marijuana derivative that was dangerous to children. . .the products were created by taking real candy products, spraying them with 'this illegal substance' and then repackaging them". *Id.* at 860. Of course, none of this was true, the charges against the store owners were dismissed, and the Court permitted the civil conspiracy claims to stand against the Defendants holding, "Operation Candy Crush had an obviously illegitimate purpose, known by the conspirators, prior to the overt act . . . [it was] illegitimate from the outset and leadership knew the raids lacked probable cause prior to their execution." *Id.* at 865. Here, similarly the raids unquestionably give rise to constitutional violations, and Petitioners are likely to succeed regarding those claims.

**IV. PETITIONERS WILL SUFFER IRRPERABLVE HARM ABSENT AN INJUNCTION**

Petitioners will suffer multiple irreparable harms unless the Court enjoins Respondents from enforcing the Revised Regulations and from conducting unreasonable searches and seizures in violation of Petitioners' Fourth Amendment rights.

As a threshold matter, "[i]n the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm." *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 448 (D. Conn. 2020); *see also*, *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19,

14

41 (S.D.N.Y. 2020) ("Plaintiffs and Plaintiff-Intervenors have shown irreparable injury because they allege a violation of their constitutional rights in connection with election results that will soon be certified as final."); *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) ("[T]he constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm."); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]here was no abuse of discretion in concluding that the Plaintiffs faced irreparable harm in the form of a deprivation of constitutional rights absent a preliminary injunction."); *Andre-Rodney v. Hochul*, 569 F. Supp. 3d 128, 141-42 (N.D.N.Y. 2021) (stating that "[a] court will presume that a plaintiff has established irreparable harm . . . if the claim involves the alleged deprivation of a constitutional right," but the plaintiff must also "convincingly" show that "the constitutional deprivation ... carries noncompensable damages.").

Where a petitioner's business is harmed by a constitutional violation (as happened here because petitioners' businesses will not be able to sell a large portion of their products), the harm is irreparable even if the Petitioners' loss of business could be compensated with monetary damages. *Am. Trucking Ass'ns*, 559 F.3d at 1059. There is no question that the enforcement of the Revised Regulations is a gross violation of Petitioners' Constitutional rights. For this reason alone, the harm they suffer is "irreparable".

Second, Petitioners also suffer the irreparable harm of being precluded from selling their products in the New York retail hemp market, having their reputations tarnished unless the Court issues a preliminary injunction, and lack the ability to quantify their damages. These too constitute irreparable harm.

Once again, *North Fork Distribution* is instructive, if not dispositive. 203 N.Y.S.3d at 505-06. There, the Court cited the State's arguments against a finding of irreparable harm, and discredited them. The Court stated:

> Respondents argue that while the regulations inflict harm on petitioners' businesses, any injury suffered can be quantified by calculating diminished profits. That is, any losses can be measured in terms of dollars and cents. Therefore, since money can make petitioners whole, they have not sustained an irreparable injury.

*Id.* at 505.

The Court disagreed citing to the Petitioners' arguments regarding their irreparable harm in light of the adoption of the Emergency Regulations, to wit: "Petitioners. . .claim three different variants of irreparable harm – (1) loss of good will; (2) loss of profits that are too speculative to quantify; and (3) loss of market share." *Ibid.* The Court addressed each in turn.

First, the Court found irreparable injury as a result of a loss of good will. The Court cited *Battenkill Veterinary Equine P.C. v. Cangelosi*, 1 A.D.3d 856, 859 (3d Dept. 2003), which held, "loss of goodwill associated with a business is difficult to quantify, can constitute irreparable injury". *See also Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").

Second, the Court credited Petitioners' argument that their inability to quantify their damages as a result of the emerging market for hemp products also constitutes irreparable harm. The Court held:

> Second, petitioners argue that the hemp products represent a new venture, and it is difficult for new businesses to prove losses. Correct—damages to compensate a new business's lost profits trend suppositionally. That is, "[g]iven the lack of a sales history and the difficulty in establishing the extent of damage to [petitioners' reputation (i.e., goodwill)] resulting from [the emergency

16

> regulation], any attempt to calculate damages could be considered too speculative" (*Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991). The regulations, in this context, consequently, trigger damages incalculable and harm irreparable in nature.

*North Fork Distributions, Inc*, 203 N.Y.S.3d at 506.

Lastly, the Court agreed the loss of market share constitutes irreparable harm finding:

> Since the regulations have the effect (and purpose) of shifting consumers from petitioners' hemp products to respondents' preferred vendors of similar intoxicants, the regulations will result in petitioners losing market share. Given that a "loss of current or future market share constitutes irreparable harm," (*In re Lasertron, Inc. v. Empire State Dev. Corp.*, 138 N.Y.S.3d 844, 852 (Sup. Ct., Erie Cnty. 2021), the court holds that petitioners have suffered or will suffer this variant of irreparable harm as well, absent injunctive relief.
>
> [*Id.* at 507; *See also Andre-Rodney*, 569 F. Supp. 3d at 141-42 (holding that the mere exclusion from the market constitutes irreparable harm).]

Here, as articulated in the Petition, Petitioners are losing business on a daily basis as a result of their inability to sell lawful product. Their customers are either looking elsewhere to obtain the products or giving up on them entirely. Further, the raids, like the ones Hidden Hemp and The Green Room were subject to, are damaging the Petitioner's reputations as law abiding businesses, and forcing them to close altogether. For this additional reason the impact of the Revised Regulations undoubtedly leads to irreparable harm and must be put to an end.

### V.  THE BALANCE OF THE EQUITIES FAVORS PETITIONERS

A preliminary injunction will not harm Respondents. Respondents were already enjoined from implementing the same Emergency Regulations on November 9, 2023. *North Fork Distributions, Inc*, 203 N.Y.S.3d at 507.

On the other hand, if the Court allows the Revised Regulations to remain in effect, it will drive Petitioners out of business altogether, ruining livelihoods. Thus, the balance of equities

17

heavily weighs in favor of Petitioners. *Ibid.* ("[t]he regulations may be sufficient to drive petitioners out of business. The concomitant loss of employment will impose desperate economic straits on the workers who have fed, sheltered, and provided medical care to their families for the last two years. And in the current difficult market, new employment may not easily be found.")

"[T]he public interest is best served by enjoining the enforcement of [a cannabis licensing] ordinance that is likely unconstitutional." *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021). The public interest is further served by protection of interstate participation in a cannabis market. *See Toigo v. Dept. of Health and Sr. Servs.*, 549 F. Supp. 3d 985, 996 (W.D. Mo. 2021) ("The public interest is best served by the protection of [an applicant's] constitutional right to fully participate in the medical marijuana business in Missouri on the same footing as a Missouri resident, a right that is likely being violated by the State's durational residency requirement.").

**VI.   A BOND IS NOT REQUIRED**

The Court should not require the Petitioners to post an injunction bond. A district court has the discretion to determine that no injunction bond is required. *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004); *JTH Tax LLC v. Kukla*, WL 1651074 (E.D.N.Y. Apr. 26, 2022). A court will waive the bond requirement where the Petitioners bring an action that promotes the public's interest, such as this action to enforce their constitutional rights. *Pharm. Soc. of State of New York, Inc. v. New York State Dep't of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995); *Hartford Courant Co., LLC v. Carroll*, 474 F. Supp. 3d 483, 508 (D. Conn. 2020); and *Libertarian Party of Conn. v. Merrill*, WL 10405920, at *8 (D. Conn. Jan. 26, 2016).

The moving party's size and financial resources may also be considered in setting a reduced amount. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000); *Color Me House, Inc. v. Discovery Commc'ns, Inc.*, 2013 WL 1283806, *10 (W.D. Wash. March 27, 2013);

*BioPure Healing Prod., LLC v. WellNX Life Scis., Inc.*, WL 4168279, at *1 (W.D. Wash. Sept. 20, 2017). Given that Petitioners all own businesses that have been drastically and negatively affected by the Revised Regulations, they should not be required to post a bond even at a reduced amount. While the party seeking a preliminary injunction may be required to post a bond, it must be proportional to any damages, costs, or fees suffered by the opposing party as a result of the preliminary injunction. *See* Fed. R. Civ. P. 65(c); L. Civ. R. 65-231(c), 65.1-151. As opposed to Petitioners who have already suffered and continue to suffer damages as a result of Respondents actions, Respondents will not suffer any damages from the implementation of the preliminary injunction. Accordingly, a bond should not be required.

## VII. CONCLUSION

For the reasons set forth above, Petitioners ask this Court to issue a preliminary injunction to prevent Respondents from implementing and/or enforcing the Revised Regulations and preclude Respondents from conducting unreasonable searches and seizures in violation of Petitioners' Fourth Amendment rights.

Dated: March 6, 2024

                                              MANDELBAUM BARRETT PC
                                              Attorneys for Petitioners

By: _____
      JOSHUA S. BAUCHNER, ESQ.
      JED M. WEISS, ESQ.
      570 Lexington Avenue, 21st Floor
      New York, New York 10022